UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

     v.

<u>Nicholas J. Patten</u>

Criminal No. 18-cr-073-LM-1
Opinion No. 2021 DNH 022 P

# **O R D E R**

The defendant, Nicholas J. Patten, moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A) based on the combination of his underlying medical conditions and the possibility that he will become infected with COVID-19 while imprisoned at Federal Correctional Institute ("FCI") Allenwood-Low in Pennsylvania. <u>See</u> doc. no. 22. The government concedes that Mr. Patten has exhausted his administrative remedies and that there are extraordinary and compelling reasons for release, but nevertheless objects based on the sentencing factors. The court held a video hearing on Mr. Patten's motion on January 12, 2021, at which Mr. Patten appeared via telephone and made a statement. After careful consideration and for the reasons that follow, the court grants Mr. Patten's motion.

## STANDARD OF REVIEW

A court may grant so-called "compassionate release" to a defendant under 18 U.S.C. § 3582(c)(1)(A). This statute imposes several requirements for granting a defendant's motion for compassionate release. First, the defendant must either

fully exhaust his administrative remedies within the Bureau of Prisons ("BOP") or wait thirty days after BOP receives his request to file a compassionate release motion on his behalf.  <u>See</u> 18 U.S.C. § 3582(c)(1)(A).  Second, there must be "extraordinary and compelling reasons" for a sentence reduction.  § 3582(c)(1)(A)(i).  Third, the court must "consider[ ] the factors set forth in section 3553(a) to the extent they are applicable."  <u>Id.</u>  Finally, a sentence reduction must be "consistent with applicable policy statements issued by the Sentencing Commission."  <u>Id.</u>; <u>see also</u> U.S.S.G. § 1B1.13 (sentencing guidelines policy statement on compassionate release).

The Sentencing Commission's policy statement on compassionate release largely mirrors the statutory language and adds the requirement that the defendant be unlikely to pose a danger to the safety of any other person or the community as provided in 18 U.S.C. § 3142(g).  <u>See</u> U.S.S.G. § 1B1.13(2).  However, the policy statement has not been updated since enactment of the First Step Act, which amended 18 U.S.C. § 3582(c)(1)(A) to allow defendants, rather than BOP alone, to petition the court for compassionate release.  <u>See</u> United States v. Brooker, 976 F.3d 228, 231-34, 236 (2d Cir. 2020) (holding that the policy statement does not apply to motions for compassionate release brought by defendants).  Even absent the policy statement, however, a defendant's dangerousness is a paramount concern under § 3553(a), which the court is required to consider in every compassionate release case.  <u>See</u> 18 U.S.C. § 3582(c)(1)(A); 18 U.S.C. § 3553(a)(1), (2)(C) (court must consider "the nature and circumstances of the defendant's offense," the

defendant's "history and characteristics," and the need "to protect the public from further crimes of the defendant"); United States v. Bradshaw, No. 1:15-CR-422, 2019 WL 7605447, at *3 (M.D.N.C. Sept. 12, 2019) (noting overlap between policy statement's dangerousness requirement and analysis of § 3553(a) factors).

The defendant bears the burden of showing he is entitled to a sentence reduction. United States v. Hilow, No. 15-CR-170-JD, 2020 WL 2851086, at *3 (D.N.H. June 2, 2020). "And the court has broad discretion in deciding whether to grant or deny a motion for a sentence reduction." United States v. Britton, No. 18-CR-108-LM, 2020 WL 2404969, at *2 (D.N.H. May 12, 2020) (quotation omitted).

## BACKGROUND

The grand jury indicted Mr. Patten on these charges on May 16, 2018, and a warrant for his arrest issued that same day. Mr. Patten was arrested pursuant to that warrant on September 5, 2018. He has been in custody since that time. On January 29, 2019, Mr. Patten pled guilty pursuant to a plea agreement on one count of possession with intent to distribute a controlled substance and one count of possession of a firearm and ammunition by an unlawful user of a controlled substance. See 21 U.S.C. § 841(a)(1); 18 U.S.C. § 922(g)(3). The parties' plea agreement contained a stipulation to a 48-month sentence under Federal Rule of Criminal Procedure 11(c)(1)(C). On May 29, 2019, the court sentenced Mr. Patten to a 48-month term of imprisonment and a three-year period of supervised release. The court also recommended to BOP that Mr. Patten participate in BOP's intensive

3

drug education and treatment program while incarcerated.  Mr. Patten has served more than one-half of his 4-year sentence.  On December 17, 2020, Mr. Patten filed the instant motion for compassionate release.

## DISCUSSION

Mr. Patten has exhausted his administrative remedies.  The BOP denied Patten's request for a reduction in sentence (doc. no. 22-1), so his motion is properly before the court.  Thus, to determine whether Mr. Patten is eligible for a sentence reduction, the court must consider: (1) whether there are extraordinary and compelling reasons for a sentence reduction; and (2) applicable sentencing factors under § 3553(a).  See 18 U.S.C. § 3582(c)(1)(A).

I.    Extraordinary and Compelling Reasons

Mr. Patten contends that he has several medical conditions that put him at a high risk for experiencing severe illness should he contract COVID-19.  The government concedes that Mr. Patten's medical conditions meet the "extraordinary and compelling" prong of the test for early release.

Specifically, Mr. Patten has Hepatitis C, chronic elevation of liver enzymes suggesting a diagnosis of nonalcoholic fatty liver disease, a "mildly heterogeneous" liver, and hyperlipidemia (more commonly known as high cholesterol).  Doc. no. 22 at 4-5.  He also states that, as of September 9, 2019, his body mass index (BMI) was 28.7.  Mr. Patten argues that these conditions, combined with the known presence

of COVID-19 at FCI Allenwood-Low, constitute extraordinary and compelling

reasons for a sentence reduction.

In the context of the current pandemic, courts have held that a generalized

risk of infection by the virus is not, by itself, sufficient to constitute an

extraordinary and compelling reason for release.  See United States v. Ramirez, 459

F. Supp. 3d 333, 337-38 (D. Mass. 2020) (collecting cases).  "On the other hand, a

combination of health and age factors that put a prisoner at a substantially higher

risk due to COVID-19 along with a documented risk of the disease in the facility

where the defendant is incarcerated may demonstrate extraordinary and compelling

reasons to reduce the prisoner's sentence."  United States v. Bischoff, 460 F. Supp.

3d 122, 125 (D.N.H. 2020); see also, e.g., United States v. Rich, 471 F. Supp. 3d 441,

446-47 (D.N.H. 2020) (finding that defendant's documented history of bronchitis,

reactive airway disease, and smoking combined with current outbreak at

defendant's prison constituted extraordinary and compelling reason for release).

When determining whether a defendant is at a particularly high risk of

experiencing severe illness from COVID-19, courts have generally looked to the

CDC guidelines.  See, e.g., United States v. Nygren, 1:16-cr-00106-JAW, 2020 WL

4208926, at *11-12 (D. Me. July 22, 2020).  The CDC emphasizes that "COVID-19 is

a new disease" and that currently there is "limited data and information about the

impact of many underlying medical conditions on the risk for severe illness from

COVID-19."[1]  Based on the limited information known, the CDC has identified certain categories of people who are at an increased risk for experiencing severe illness from COVID-19: older adults and people of all ages with certain underlying medical conditions.[2]

The CDC states that persons with chronic liver disease may be at an increased risk of severe illness from COVID-19.[3]  Here, Mr. Patten has multiple chronic liver conditions, including hepatitis C and nonalcoholic fatty liver disease. The CDC expressly acknowledges that nonalcoholic fatty liver disease is a chronic liver condition that may increase the risk of contracting a severe case of COVID-19.[4] In addition, the CDC states that being overweight—i.e., having a BMI of between 25 and 30—might increase the risk of severe illness from COVID-19.[5]  Mr. Patten asserts, and the government does not contest, that BOP recorded his BMI as 28.7 in

---

[1] CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Jan. 6, 2021).

[2] CDC, People at Increased Risk, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited Jan. 6, 2021).

[3] CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Jan. 6, 2021).

[4] CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Jan. 6, 2021).

[5] CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Jan. 6, 2021).

September 2019.  The court concludes that, when considered together, Mr. Patten's chronic liver conditions and his BMI, both of which are recognized by the CDC as potential risk factors, increase the risk that he will suffer a severe case of COVID-19.  See United States v. Gonzalez-Quiroz, No. 18-CR-4517 (DMS), 2020 WL 3868751, at *2 (S.D. Cal. July 9, 2020) (defendant demonstrated extraordinary and compelling reason for release where he suffered from fatty liver disease and hypertension and had a BMI of approximately 37); United States v. Khawaja, Crim. No. 18-cr-127-LM, 2020 WL 5549123, at *3-4 (D.N.H. Sept. 16, 2020) (defendant demonstrated extraordinary and compelling reason for release where he suffered from two conditions recognized by CDC to potentially increase risk from COVID-19).

In addition, Mr. Patten suffers from hyperlipidemia.  While elevated cholesterol is not a medical condition expressly recognized by the CDC to increase the risk from COVID-19, the CDC does recognize that "[t]he more underlying medical conditions someone has, the greater the risk is for severe illness from COVID-19."[6]  As this court has previously recognized, "[t]he collective risks associated with several non-serious medical conditions, when considered together and in combination with the risks posed by COVID-19 in the defendant's facility, can provide an extraordinary and compelling reason to reduce the defendant's

---

[6] CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2F www.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#liver-disease (last visited Jan. 6, 2021).

sentence." Hilow, 2020 WL 2851086, at *4; see United States v. McElrath, No. 3-cr-235 (JNE)(1), 2020 WL 5423067, at *2 (D. Minn. Sept. 10, 2020) (defendant's numerous medical conditions, including hyperlipidemia, constituted an extraordinary and compelling reason for release when considered together).  Even if some of Mr. Patten's conditions do not "independently and perfectly fit the definition of severity, as outlined by the CDC, his conditions still exacerbate each other," including those conditions that the CDC does recognize as potential risk factors for a severe case of COVID-19.  Harrell v. United States, Crim. No. 13-20198, 2020 WL 2768883, at *3 (E.D. Mich. May 28, 2020).

The risk that Mr. Patten will be infected with COVID-19 at FCI Allenwood-Low is more than speculative.  Many courts, including this one, have recognized that the nature of the prison environment itself increases the likelihood that prisoners will catch this highly contagious virus.  See, e.g., Gomes v. U.S. Dep't of Homeland Sec., Acting Sec'y et al., 460 F. Supp. 3d 132, 138-39 (D.N.H. 2020).  Prisons, by nature of their size, the number of inmates, and the difficulty of keeping inmates physically distant from one another, are potential tinderboxes for this contagious virus.  Khawaja, 2020 WL 5549123, at *5.  This is especially true where there is already a documented outbreak at the prison.  As of January 12, 2021, FCI Allenwood-Low reported that 229 inmates have recovered from COVID-19 since the beginning of the pandemic.[7]  This indicates that the facility at one time experienced

---

[7] BOP, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (last visited Jan. 12, 2021).

a serious outbreak.  See Khawaja, 2020 WL 5549123, at *5.  In addition, at the time

of Mr. Patten's hearing, FCI Allenwood-Low reported twenty-one active cases of

COVID-19.[8]  Nine of those active cases were among inmates, and twelve were

among staff.[9]  For these reasons, there is a documented risk that Mr. Patten could

become infected with COVID-19 at FCI Allenwood-Low.

In summary, the court agrees with the government and Mr. Patten on this

prong.  Mr. Patten's medical conditions combined with a documented risk that he

could contract the virus at FCI Allenwood-Low constitute extraordinary and

compelling reasons for a sentence reduction.


II.   Sentencing Factors

Next, the court must consider whether a sentence reduction would be

consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a) to the extent

they are applicable.  See 18 U.S.C. § 3582(c)(1)(A).  The § 3553(a) factors that a

court must consider at sentencing include the nature and circumstances of the

defendant's offense and the defendant's personal history and characteristics.  18

U.S.C. § 3553(a)(1).  The statute also requires that the court ensure the sentence

imposed adequately reflects the seriousness of the offense, promotes respect for the

---

[8] BOP, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (last visited
Jan. 12 2021).

[9] BOP, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (last visited
Jan. 12 2021).

law, provides just punishment, affords adequate deterrence, protects the public from further crimes of the defendant, and provides the defendant with needed training, medical care, and other treatment in the most effective way.  18 U.S.C. § 3553(a)(2).  The statute further requires the court to consider the kinds of sentences available, the Sentencing Guidelines, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to any victim.  18 U.S.C. § 3553(a)(3)-(7).

The court assesses the relevant sentencing factors below.  After considering the applicable factors, the court will consider whether those factors support a reduction in Mr. Patten's sentence, or, alternatively, whether they outweigh the extraordinary and compelling reasons discussed above and compel denial of the motion.  United States v. Perkins, ___ F. Supp. 3d ___, 2020 WL 4783558, at *5 (D.N.H. Aug. 18, 2020); see, e.g., United States v. Tidwell, ___ F. Supp. 3d ___, 2020 WL 4504448, at *6 (E.D. Pa. Aug. 5, 2020).

The bulk of the sentencing factors weigh in favor of compassionate release. Most importantly, Mr. Patten has served more than half of his sentence.  With good time credits, his current release date is on January 31, 2022, approximately one year from now.  It appears that he will receive his good time credits, as there is no indication that he has had any disciplinary infractions while incarcerated. Additionally, BOP has assigned him an eligibility date for home detention of September 8, 2021; and he is currently scheduled to be released to a residential reentry center on October 6, 2021.  Because Mr. Patten has served a significant

portion of his original sentence and is nearing his release date from BOP, a reduction in his sentence would not be inconsistent with the goals of promoting respect for the law, providing just punishment for his offense, and affording adequate deterrence to criminal conduct.

The only sentencing factor that weighs against his release is the need "to protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C); see also U.S.S.G. § 1B1.13(2) (policy statement instructing courts to evaluate whether the defendant is "a danger to the safety of any other person or to the community").  Mr. Patten's release poses a danger to the public.  His current conviction is for a serious drug distribution offense and an illegal gun possession charge.  The combination of firearms and drug distribution is inherently dangerous. There are numerous facts, however, that mitigate Mr. Patten's dangerousness.

First, prior to this federal conviction, Mr. Patten had never been sentenced to imprisonment.  He has no prior convictions for violence or use of weapons, and has a minimal criminal history.  He has only two prior convictions: one for disobeying a police officer, and one for unlawfully entering an acquaintance's home to obtain drugs.  The latter charge was from a Massachusetts court; the case was continued without a finding and later dismissed.  See Commonwealth v. Mosher, 920 N.E.2d 285, 296 (Mass. 2010) (explaining that a "continuance without a finding closely resembles a sentence of straight probation, except that the former is not a 'conviction' under [Massachusetts] law if the defendant successfully completes" the prescribed probation).  Mr. Patten had zero criminal history points and a criminal

history category of I—the lowest category a defendant can have—at sentencing. According to BOP, Mr. Patten's "current risk of recidivism is low."  Doc. no. 23 at 9.

Second, the major risk factor for Mr. Patten is his serious addiction to cocaine and opiates, and this can be mitigated with conditions.  Mr. Patten has used drugs since he was twelve years old.  His presentence report indicated that, at the time of arrest, he was intravenously injecting up to 7.5 grams of cocaine on a daily basis and had been a daily heroin and opiate user.  Mr. Patten's ongoing battle with addiction in his teens and as an adult have caused him to overdose on heroin more than ten times.  As the court noted at Mr. Patten's sentencing hearing, his criminal history—though relatively minimal—is entirely related to his drug addiction.  See doc. no. 21 at 7.

A close look at the circumstances of Mr. Patten's instant offense reveals the serious nature of his drug addiction and its relationship to his criminal history.  On February 11, 2018, an officer with the New London Police Department found Mr. Patten asleep in his parked car.  When the officer approached Mr. Patten's car, he saw several needles, rubber tourniquets, a syringe, and white powder on Mr. Patten's pants and the car's center console.  The officer suspected that Mr. Patten may have overdosed and called for emergency medical services.  While awaiting medical aid, Mr. Patten woke up and began screaming for help, and saying things like "I'm drowning," and "I'm trapped."  The officer was eventually able to calm Mr. Patten.  When additional officers arrived, they arrested Mr. Patten seemingly without further incident, and Mr. Patten admitted to the officers that he was high.

Indeed, in Mr. Patten's sentencing memorandum, he stated that he likely would have died of an overdose had the police not found and arrested him.  See doc. no. 16 at 4.

The circumstances of Mr. Patten's arrest indicate that he was a serious drug addict as well as a drug distributor.  A search of his vehicle the day after his arrest uncovered two "bricks" containing nearly 200 grams of cocaine, a briefcase containing $4,420 bound in rubber bands, and a loaded firearm, in addition to smaller, personal use amounts of various drugs.  These facts are concerning from the standpoint of Mr. Patten's dangerousness.  Nevertheless, the court concludes that, on balance, the nature and circumstances of the defendant's offense are more consistent with that of a person with a crippling drug addiction, rather than that of a hardened and dangerous drug distributor.  Despite the presence of the firearm, the court concludes that the circumstances of the instant offense suggest that, to the extent Mr. Patten is likely recidivate, he will do so by using drugs rather than by committing violent crimes.

The court recommended at sentencing that BOP place Mr. Patten in its residential drug treatment program while incarcerated.  Because of his gun charge, however, Mr. Patten does not qualify for admission into that program.  To his credit, Mr. Patten has completed the nonresidential drug treatment program at FCI Allenwood-Low.  In addition to his recent completion of the program at FCI Allenwood, there are many indications in Mr. Patten's history that suggest he genuinely wants drug treatment.  According to his mother—who made a statement

13

at this compassionate release hearing—he has previously been sober for a period of three consecutive years.  Mr. Patten has participated in at least eight treatment programs.  In 2018 he successfully completed an inpatient program at Valley Vista in Bradford, Vermont.  While at Valley Vista, he received treatment for opioid use disorder and stimulant use disorder, engaged in individual and group therapy, and participated in self-help groups.  He was discharged to a sober living house after completing this program.  These repeated periods of active recovery show Mr. Patten's commitment to sustained sobriety.  Since Mr. Patten has a history of relapsing, however, he needs long-term drug treatment to include regular drug testing and strict conditions of supervision.

Should Mr. Patten engage meaningfully in drug treatment, his risk of danger would be greatly reduced.  The goal of public protection would be well served should Mr. Patten successfully complete drug treatment as part of his early release.  The court will therefore impose drug treatment as a condition of his release.  If released, Mr. Patten would reside with his mother in Weymouth, Massachusetts, where he would have the support of family.  Mr. Patten maintains a close relationship with both of his parents.  His mother is well-aware of Mr. Patten's drug addiction and has stated her commitment to assisting and supporting his recovery.  Probation has recently deemed this home suitable for supervision.

Finally, imprisonment at FCI Allenwood-Low is not serving the goal of providing Patten with needed drug treatment "in the most effective manner."  18 U.S.C. § 3553(a)(2).  As explained, Mr. Patten desperately needs drug treatment.  It

appears he may have exhausted the intensive treatment options available to him at FCI Allenwood-Low.  If released to his mother's home, Mr. Patten will be required to participate in an intensive treatment program in the community, and he will have the support of his family.  Because a sentence reduction would provide Mr. Patten with needed drug treatment in a more effective manner than if he were to remain imprisoned, this factor weighs heavily in favor of release.  See Khawaja, 2020 WL 5549123, at *7.

Because the only § 3553(a) factor that weighs against release is adequately mitigated by a term of home confinement to last until his projected release date of January 31, 2022, with strict conditions of supervision to include intensive drug treatment and testing, the court concludes that the balance of factors weigh in favor of release.

## CONCLUSION

For the foregoing reasons, Mr. Patten's motion for compassionate release (doc. no. 22) is granted as follows:

1. Mr. Patten's sentence will be reduced to time served.

2. Mr. Patten will be placed on a special term of supervised release until January 31, 2022, which is equivalent to what his discharge date would have been from the BOP, during which time he will remain on home confinement under the terms of release as outlined in Appendix A.

15

3.  Following the term of special supervised release, Mr. Patten will be placed on supervised release for a term of three years.

4.  During the terms of special supervised release and supervised release, Mr. Patten shall be subject to the Supervision Conditions as set forth in Appendix A.

5.  The BOP shall release Mr. Patten immediately following processing.

6.  The court recommends that the BOP screen Mr. Patten for COVID-19 within twelve hours prior to his release, and if he is displaying symptoms consistent with COVID-19, test him and share the results with the United States Probation Office in the District of New Hampshire.

7.  The court will issue an amended criminal judgment.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

January 27, 2021

cc:  Counsel of Record
     U.S Probation
     U.S. Marshal

16

## APPENDIX A

SUPERVISION CONDITIONS

While under supervision, the defendant must comply with the following mandatory conditions:

1. The defendant must not commit another federal, state, or local crime.

2. The defendant must not unlawfully possess a controlled substance.

3. The defendant must refrain from any unlawful use of a controlled substance. The defendant must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed 72 drug tests per year.

4. The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

5. The defendant must cooperate in the collection of DNA as directed by the probation officer.

While under supervision, the defendant must also comply with the following standard conditions of supervision that have been adopted by this court:

1. The defendant must report to the probation office in the federal judicial district where he is authorized to reside within 72 hours of his release from imprisonment, unless the probation officer instructs him to report to a different probation office or within a different time frame.

2. After initially reporting to the probation officer, the defendant will receive instructions from the court or probation officer about how and when he must report to the probation officer, and he must report to the probation officer as instructed.

3. The defendant must not knowingly leave the federal judicial district where he is authorized to reside without first getting permission from the court or probation officer.

4. The defendant must answer truthfully the questions asked by his probation officer.

5. The defendant must live at a place approved by the probation officer. If he plans to change where he lives or anything about his living arrangements

(such as the people he lives with), he must notify the probation officer at least 10 days before the change.  If notifying the probation officer in advance is not possible due to unanticipated circumstances, he must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.  The defendant must allow the probation officer to visit him at any time at his home or elsewhere, and he must permit the probation officer to take any items prohibited by the conditions of his supervision that the probation officer observes in plain view.

7.  The defendant must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses him from doing so. If he does not have full-time employment he must try to find full-time employment, unless the probation officer excuses him from doing so.  If he plans to change where he works or anything about his work (such as his position or his job responsibilities), he must notify the probation officer at least 10 days before the change.  If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, he must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.  The defendant must not communicate or interact with someone he knows is engaged in criminal activity.  If he knows someone has been convicted of a felony, he must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.  If the defendant is arrested or questioned by a law enforcement officer, he must tell the probation officer within 72 hours.

10. The defendant must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e, anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. The defendant must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the probation officer determines that the defendant poses a risk to another person (including an organization), the probation officer may require him to notify the person about the risk and the defendant must comply with that instruction.  The probation officer may contact the person and confirm that the defendant has notified the person about the risk.

13. The defendant must follow the instructions of the probation officer related to the conditions of supervision.

In addition, the defendant must comply with the following special conditions:

1. Upon release, the defendant must obtain transportation directly from the prison to your approved residence. The defendant must eliminate or minimize any stops during that transport.

2. The defendant must self-quarantine in an approved residence during the first fourteen days of your supervised release.

3. The defendant is restricted to his residence at all times for the first six (6) months of supervised release except for: employment; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by the officer. During this time period, the defendant's location will be monitored at the discretion of his probation officer. The probation officer will determine what type of technology to use to monitor the defendant. The defendant must follow the rules and regulations of any monitoring program. The defendant must pay for the cost of the program to the extent he is able, as determined by the probation officer.

4. The defendant must participate in an inpatient or outpatient substance abuse treatment program and follow the rules and regulations of that program. The probation officer will supervise the defendant's participation in the program (provider, location, modality, duration, intensity, etc.). The defendant must pay for the cost of treatment to the extent he is able, as determined by the probation officer.

5. The defendant must submit to substance abuse testing to determine if he has used a prohibited substance. The defendant shall pay for the cost of testing to the extent he is able, as determined by the probation officer. The defendant must not attempt to obstruct or tamper with the testing methods.

6. The defendant must not go to, or remain at, any place where he knows controlled substances are illegally sold, used, distributed, or administered without first obtaining the permission of the probation officer.

7. The defendant must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g., synthetic marijuana, bath salts, etc.) that impair a person's physical or mental functioning, whether or

not intended for human consumption, except with the prior approval of the probation officer.

8.  The defendant must not use or possess any controlled substances without a valid prescription.  If the defendant does have a valid prescription, he must disclose the prescription information to the probation officer and follow the instructions on the prescription.

9.  The defendant must submit his person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer.  Failure to submit to a search may be grounds for revocation of release.  The defendant must warn any other occupants that the premises may be subject to searches pursuant to this condition.  The probation officer may conduct a search under this condition only when reasonable suspicion exists that the defendant has violated a condition of supervision and that the areas to be searched contain evidence of this violation.  Any search must be conducted at a reasonable time and in a reasonable manner.